USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/28/18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

M.C. and G.C., on behalf of their minor child, J.C.,

Plaintiffs-Appellants,

-against-

The Mamaroneck Union Free School District,

Defendant-Appellee.

No. 17-cv-1554 (CM)

**DECISION AND ORDER AFFIRMING THE DECISION OF THE STATE REVIEW OFFICER AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

McMahon, C.J.:

Before the Court is Plaintiffs' motion for summary judgment in this action arising under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.* (2012). Plaintiff J.C., by his parents, M.C. and G.C. ("Parents"), allege that Defendant, The Mamaroneck Union Free School District ("the District"), failed to provide J.C. with the Free and Appropriate Public Education ("FAPE") to which he was entitled under the IDEA. Parents appeal the decision of the New York State Review Officer, who ruled that the District provided J.C. with a FAPE for the two school years at issue and therefore denied Parents tuition reimbursement for J.C.'s alternative placement at a private school. For the reasons that follow, the Court affirms the decision of the SRO.

## BACKGROUND

### I. IDEA Framework

Under the IDEA, states receiving federal education funding must provide all children with disabilities a FAPE. 20 U.S.C. § 1412(a)(1)(A); *see also M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 135 (2d Cir. 2013). This requires the state to provide "special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A); *see also J.S. v. N.Y.C. Dep't of Educ.*, 104 F. Supp. 3d 392, 400 (S.D.N.Y. 2015). The centerpiece and primary vehicle for implementing these congressional goals is the Individualized Educational Plan ("IEP"). *See Honig v. Doe*, 484 U.S. 305, 311 (1988).

In New York, a Committee on Special Education ("CSE") develops IEPs for eligible students. N.Y. Educ. Law § 4402(1)(b)(1) (McKinney 2017); *see also J.E. v. N.Y.C. Dep't of Educ.*, 229 F. Supp. 3d 223, 230 (S.D.N.Y. 2017). New York law requires that the CSE include, at least, the parent(s) or guardian(s) of the student; the student's regular education teacher; the student's special education teacher; a school psychologist; and a district representative qualified to administer or supervise special education and knowledgeable about the district's curriculum and resources. N.Y. Educ. Law § (1)(b)(1)(a); *see also J.E.*, 229 F. Supp. 3d at 231.

In developing a particular student's IEP, the CSE must consider that student's (1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs. *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107 – 08. It must also keep in mind the IDEA's "strong preference for mainstreaming," or educating children with disabilities alongside their non-disabled peers, in the least restrictive environment. *Id.* at 108 (internal quotation marks omitted) (quoting 20 U.S.C. § 1412(a)(5)). New York State

defines the least restrictive environment as one that (1) provides the special education the student needs; (2) with other students who do not have handicapping conditions, to the maximum extent appropriate; and (3) in a place as proximate as possible to the student's place of residence. *Id.*

Ultimately, the CSE must set forth in the IEP an educational program that is "reasonably calculated to enable the child to receive educational benefits." *Bd. of Educ. of Hendrick Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 204 (1982); *see also R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012).

If they believe their child's IEP does not comply with the standards of the IDEA, parents have the option to file a due process complaint ("DPC") – a type of administrative challenge unrelated to the concept of constitutional due process – with the appropriate state agency. 20 U.S.C. § 1415(b)(7)(A); *see also R.E.*, 694 F.3d at 175. This begins a process starting with a hearing before an Impartial Hearing Officer, during which the school district bears the burden proving the adequacy of the proposed IEP. N.Y. Educ. Law § 4404(1); *see also F.O. v. N.Y.C. Dep't of Educ.*, 976 F. Supp. 2d 499, 506 (S.D.N.Y. 2013).

Parents who elect to unilaterally place their child in a private school may seek retroactive tuition reimbursement during the IHO hearing. *See J.C. v. Katonah-Lewisboro Sch. Dist.*, 690 Fed. Appx. 53, 54 (2d Cir. 2017). Under the *Burlington/Carter* test, parents seeking retroactive reimbursement bear the burden of proving that (1) the programming proposed in the IEP was inadequate; (2) the alternative placement chosen was appropriate; and (3) the equitable factors weigh in favor of reimbursement. *J.S. v. N.Y.C. Dep't of Educ.*, 648 Fed. App'x 96, 97 (2d Cir. 2016).

The disappointed party may appeal to a State Review Officer ("SRO"). N.Y. Educ. Law § 4404(2). After the SRO issues a decision, any party aggrieved by the findings may bring a civil action in state or federal court seeking judicial review. 20 U.S.C. § 1415(i)(2)(A).

## II. Legal Standard

In the IDEA context, summary judgment motions function as a "pragmatic procedural mechanism for reviewing administrative decisions." *A.M. ex rel. Y.N. v. N.Y.C. Dep't of Educ.*, 964 F. Supp. 2d 270, 277 (S.D.N.Y. 2013) (internal quotation marks omitted) (quoting *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 138-39). They involve "more than looking into disputed issues of fact." *Id.* (internal quotation marks omitted) (citing *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009)).

The district court undertakes a two-part inquiry when reviewing a challenge to an IEP: first, it asks whether the district complied with the procedures set forth in the IDEA; second, it asks whether the IEP, developed through the IDEA's procedures, is "reasonably calculated to enable the child to receive educational benefits." *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 245 (2d Cir. 2012).

To comply with the procedural requirements of the IDEA, the district must develop an IEP that contains (1) present levels of academic achievement and functional performance; (2) disability classification; (3) measurable annual goals; (4) short-term instructional objectives and benchmarks; (5) any recommended special education programs and services; (6) any proposed testing accommodations; (7) the reasoning behind any alternate state and districtwide assessments; (8) an explanation of extent to which the student will or will not participate with nondisabled peers in the regular class; (9) any applicable transition services; (10) a description of any twelve-month

services for which the student is eligible; and (11) the projected annual review date. 8 N.Y.C.R.R. § 200.4(d)(2).

Substantive compliance with the IDEA is less exact, as the IDEA itself does not "articulate any specific level of educational benefits that must be provided through an IEP." *M.H.*, 685 F.3d at 245. The Act requires an "appropriate education" for students eligible under its provisions, but does not require states to maximize these students' potential. *Id.* (citing *Rowley*, 458 U.S. at 189-90)). As the Supreme Court noted in *Rowley*, 458 U.S. at 192, the purpose of the IDEA was "more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside."

If the court determines that the IEP was substantively inadequate, the parents are automatically entitled to tuition reimbursement. *A.M. ex rel. Y.N. v. New York City Dep't of Educ.*, 964 F. Supp. 2d 270, 278 (S.D.N.Y. 2013). Procedural violations warrant reimbursement only if, taken together, they either impeded the student's right to a FAPE, significantly impeded the parents' opportunity to participate in the decisionmaking process, or caused a deprivation of educational benefits. *See* 20 U.S.C. § 1415(f)(3)(E)(ii); *see also R.E.*, 694 F.3d at 190.

A reviewing court must render its decision based on "the preponderance of the evidence." 20 U.S.C. § 1415(i)(2)(C)(iii). This is by no means an invitation to substitute the court's own notions of sound educational policy for those of the school authorities which it is reviewing. *Rowley*, 458 U.S. at 206. Rather, mindful of "the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy," a reviewing court must accord due weight to the prior administrative proceedings. *Y.N.*, 964 F. Supp. 2d at 277.

The appropriate weight applicable to any particular administrative determination turns on the types of considerations which "normally determine whether any particular judgment is

persuasive," such as the quality of reasoning and a demonstrated familiarity with the evidence and the witnesses. *M.H.*, 685 F.3d at 244. The Second Circuit has made the following clear:

> [D]eterminations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures. Decisions involving a dispute over an appropriate educational methodology should be afforded more deference than determinations concerning whether there have been objective indications of progress. Determinations grounded in thorough and logical reasoning should be provided more deference than decisions that are not. And the district court should afford more deference when its review is based entirely on the same evidence as that before the SRO than when the district court has before it additional evidence that was not considered by the state agency.

*M.H.*, 685 F.3d at 244 (internal citations omitted). These considerations must be viewed in the light of "institutional competence and role" as "the purpose of the IDEA is to provide funding to states so that *they* can provide a decent education for disabled students consistent with their traditional role in educating their residents." *Id.*; *see also Rowley*, 458 U.S. at 208 n.30.

In the event that the IHO and SRO came to opposite conclusions, the reviewing court is "not entitled to adopt the conclusions of either state reviewer according to their own policy preferences or views of the evidence." *M.H.*, 685 F.3d at 246. As long as the SRO's determinations are sufficiently reasoned, the court must defer to the SRO's decision as the "final administrative determination." *Id.* But if the SRO has rejected a more thorough analysis conducted by an IHO, it is entirely appropriate for a reviewing court to consider the IHO's decision in reaching its own conclusion. *Id.*

A district court's review is limited to issues raised in the DPC or consented to by the district. The Second Circuit has long held that failure to exhaust the administrative remedies available with respect to any claim deprives a federal court of subject matter jurisdiction to consider that claim on appeal from the SRO. *See, e.g.*, *Cave v. E. Meadow Union Free Sch. Dist.*,

514 F.3d 240, 243 (2d Cir. 2008); *Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist.*, 288 F.3d 478, 483 (2d Cir. 2002); *Hope v. Cortines*, 69 F.3d 687, 688 (2d Cir. 1995).

## III. Factual Background

J.C. is a minor child who resides with his parents, M.C. and G.C., in the Mamaroneck School District, his home-zoned public school district. (Defs.' Resp. to Pls.' Statement of Undisputed Material Facts Pursuant to Local Rule 56 and Counter-Statements ¶ II.D.1, Dkt. No. 18 ("Defs.' 56.1").).

J.C. has a history of anxiety and verbal and motor tics, as well as difficulties with executive functions, working memory, academics, attention, social skills, language processing, and sleepiness/level of arousal. (Defs.' Resp. to Pls.' Statement of Undisputed Material Facts Pursuant to Local Rule 56 and Counter-Statements ¶ II.A.1.a, Dkt. No. 18 ("Defs.' 56.1").). He has been diagnosed with Attention Deficit Hyperactivity Disorder and Tourette Syndrome, and experiences symptoms of Obsessive Compulsive Disorder and physical tics. (*Id.* ¶ II.A.2.) The District has classified J.C. as Other Health Impaired. (*Id.* ¶ II.A.4.)

In December 2011, when J.C. was in third grade, the District recommended that he switch from the public elementary school to a State-approved therapeutic day program. (Dist. Ex. 7.) The CSE continued this recommendation for the next two school years, when J.C. was a fourth and fifth grade student. (Dist. Exs. 8-9.) Parents rejected the District's recommended program alternative placement for their son and instead placed J.C. in private program. (Dist. Ex. 8 at 2.) He attended the Pear Tree Point School for the balance of third grade and then attended Eagle Hill School for both fourth and fifth grade. (Dist. Exs. 8 at 2; 10 at 1.)

The years at issue in this case are the 2014-15 and 2015-16 school years – J.C.'s sixth and seventh grade years, respectively.

For the 2014-15 school year, J.C.'s June 2014 CSE comprised Anthony Minotti, Chairperson; Kristen Arita, Psychologist; Maria Albano, Special Education Teacher; Katie Nagrotsky, General Education Teacher; Kathy Quinn and Janice Curtain, Eagle Hill Representatives; M.C., Mother; G.C., Father; Nancy Albertson, Speech/Language Therapist. (Dist. Ex. 10 at 1.) His September 2014 CSE comprised Anthony Minotti, Chairperson; Justin Lugo, Psychologist; Cynthia KcKean, Psychologist; Maria Albano, Special Education Teacher; Scott Gilberti, General Education Teacher; Nancy Albertson, Speech/Language Therapist; M.C., Mother; and G.C., Father. (Dist. Ex. 11 at 1.)

For the 2015-16 school year, his CSE comprised Lori Freeman, Director of Special Education, PreK-12; Maria Albano, Special Education Teacher; Susan Chester, Special Education Teacher; Nancy Albertson, Speech/Language Therapist; Kristen Arita, Psychologist; Theresa Fox, David Dudics, and Syndy Margot, Eagle Hill Representatives; M.C., Mother; G.C., Father; and Patty Wolff, Parent Member. (Dist. Ex. 12 at 1.)

In March 2014, District school psychologist Kristen Arita conducted a classroom observation of J.C. at Eagle Hill. (Dist. Ex. 34 (original date appears corrected by hand).)

*2014-15 School Year*

On June 1, 2014, Parents signed a contract with Eagle Hill for J.C.'s attendance during the 2014-15 school year. (Defs.' 56.1 ¶ II.A.7.)

On June 12, 2014 – after the parents had committed to send their son to Eagle Hill – the CSE reconvened to develop programming for J.C.'s 2014-15 school year. (*Id.* ¶ II.B.1; *see also* Dist. Ex. 10.) It recommended that J.C. attend his home-zoned public school, the Hommocks Middle School, in a general education class, with a 3:1 teaching assistant for academic classes, integrated co-teaching ("ICT") services in English and Math, and enhanced staffing for lunch and

recess. (Dist. Ex. 10 at 6-7.) The CSE also recommended that J.C. receive 5:1 resource room services for 40 minutes daily, participate in a small social skills group for 30 minutes weekly, and receive individual psychological counseling for 30 minutes weekly. (*Id.* at 7.) The CSE included an assistive technology consultation to support J.C.'s "integration of his laptop into his day," and set forth nine annual goals for J.C. in the areas of reading, writing, math, study skills, and social/emotional/behavioral functioning. (*Id.*)

The CSE also referred J.C. for an updated speech-language evaluation "as part of an overall assessment to determine appropriate recommendations for the 2014-15 school year." (Dist. Ex. 39 at 1.) The CSE agreed that it would reconvene to discuss the results of the evaluation during the first two weeks of the 2014-15 school year. (Dist. Ex. 10 at 1.) District speech-language pathologist, Nancy Albertson, performed the evaluation on June 19, 2014. (Dist. Ex. 39.)

Before the school year began, on August 10, 2014, Parents forwarded a letter to Assistant Superintendent for Student Support Services, Dr. Anthony Minotti, identifying certain "errors and omissions" in J.C.'s June 2014 IEP. (Dist. Ex. 45 at 2.) They further indicated that they "wholly disagree[d]" with the appropriateness of that program and placement and expressed their belief that they had "no option other than to return [J.C.] to Eagle Hill" for the 2014-15 school year. (*Id.* at 4.)

Dr. Minotti responded to Parents by letter dated August 22, 2014, attaching a revised copy of the IEP with "those corrections that [he] believe[d] to be legitimate." (Dist. Ex. 61.) He also reiterated that the the CSE would be meeting in September to review the June 2014 speech-language evaluation. (*Id.*)

The revised IEP included weekly individual psychological counseling; double-time for testing; enhanced staffing for science and social studies; and clarified that enhanced staffing during

lunch and recess should "assist in facilitating/monitoring peer interactions." (Dist. Ex. 60 at 1, 7-8.) Two of these revisions – psychological counseling and enhanced staffing for science and social studies – had been mentioned in the original June 2014 IEP, but under the "Comments" section, rather than as recommendations; apparently this was due to an administrative error. (Dist. Exs. 10 at 1; 59-60.)[1] Albano described the changes made based on Parents' letter – *i.e.*, psychological counseling, double-time for testing, enhanced staffing for science and social studies, and the clarification for lunch and recess enhanced staffing. (Dist. Ex. 60.) But Albano noted that the revised IEP did not accept Parents' objection that ICT services and resource room "was not restrictive enough." (*Id.*) It also did not specify "how to get J.C. out of car and into school," or address how District would "prevent bullying" – though it included a recommendation for monitoring peer interactions at lunch and recess. (*Id.*)

The CSE reconvened and discussed the results of the speech-language evaluation on September 16, 2014. (Dist. Ex. 11.) They continued the placement recommendation set forth in the June 2014 IEP, but added a weekly individual speech-language therapy session, a weekly small group speech-language therapy session, a weekly speech-language therapy consultation, as-needed psychiatric consultation, five additional goals in the areas of speaking/listening and speech/language, and provided for J.C. to receive copies of class notes. (*Id.* at 8-9.) The District also requested and received Parents' consent to allow a psychiatric consultation between its psychiatrist Dr. Randall Ross and J.C.'s long-time psychiatrist, Dr. Audrey Walker. (Defs.' 56.1 ¶ II.B.13; Dist. Ex. 52.)

---

[1] In email correspondence following his receipt of Parents' August 10 letter, Dr. Minotti asked Maria Albano, the special education teacher on J.C.'s CSE, to review the IEP and "substantiate if the parents are correct." (Dist. Ex. 59; *see also* Tr. pp. 133-40.) Albano responded that she "must have missed the indiv [*sic*] counseling," but that many of the issues identified in Parents' letter were the result of "misunderstandings of the recommendations, the programs, and how things are written." (*Id.*)

Parents did not receive any information regarding Dr. Ross's opinions or recommendations following this consultation. (*Id.*)

*2015-16 School Year*

In advance of the CSE meeting to discuss the programming for 2015-16, J.C.'s seventh grade year, Parents forwarded to the District a letter from Dr. Walker dated April 20, 2015. (Dist. Ex. 55.) In her letter, Dr. Walker described her familiarity with J.C., whom she had treated since he was in first grade. She specified the clinical symptoms currently impacting J.C.'s performance at school and in his social interactions. (*Id.* at 1.) She also made a number of recommendations for J.C.'s educational program, including: a small and highly-structured classroom environment; a small student-to-teacher ratio, ideally 6:1; and flexibility in academic grouping with 1:1 support as needed to closely monitor attention and comprehension. (*Id.* at 2.)

Albano and Arita both conducted classroom observations of J.C. at Eagle Hill on March 5, 2015. (Dist. Ex. 41 at 1-2.)

The CSE met on April 20, 2015 to conduct the annual review and to develop the 2015-16 IEP. (Dist. Ex. 12.) It recommended that J.C. be placed in a general education classroom with ICT services for English and Math, and consultant teacher services in Science and Social Studies; take part in daily 5:1 resource room; participate in a weekly small social skills group; undergo weekly individual psychological counseling; and receive weekly individual, small group, and push-in speech therapy. (Defs.' 56.1 ¶ II.C.3; *see also* Dist. Ex. 12 at 8-9.)

Significant changes from the September 2014 IEP included direct consultant teacher services for Science and Social Studies instead of enhanced staffing; the removal of enhanced staffing for lunch and recess; the removal of the 3:1 teaching assistant; and the discontinuation of consultation between Dr. Ross and Dr. Walker. (*Id.* ¶ II.C.4.)

Parents acknowledged receipt of the proposed 2015-16 IEP and a transition plan on July 16, 2015. (Dist. Ex. 56.) They informed the District that they did not agree with the IEP or placements recommendations and further informed the District that they planned to return J.C. to Eagle Hill for the 2015-16 school year. (*Id.* at 2.)

## IV. Procedural History

M.C. and G.C. initiated these proceedings by filing a DPC on May 1, 2015, which they amended on September 17, 2015. (Defs.' 56.1 ¶ I.A.1; Tr. 4:7-24.) On August 1, 2016, after six days of hearings, IHO Judith Schneider found that the District failed to establish that the 2014-15 and 2015-16 programs were substantively adequate. (IHO Decision at 26, 28.) She also found that Parents had established that Eagle Hill was an appropriate placement for J.C. and ordered the District to reimburse M.C. and G.C. for the private school tuition they paid for the 2014-15 school year ($62,275) and the 2015-16 school year ($64,450). (IHO Decision at 35-36.)

The District appealed. (Defs.' 56.1 ¶ I.C.1.) Parents cross-appealed from the IHO's determinations that dismissed portions of their claims. (*Id.*)

On November 2, 2016, SRO Sarah Harrington reversed the IHO's decision in favor of Parents. She found that the IEPs for the 2014-15 and 2015-16 school years were based on sufficient evaluative material and recommended programming that was reasonably calculated to enable J.C. to receive educational benefit. (*Id.* ¶ I.C.2.)

Parents initiated this civil action appealing the SRO's decision. (Compl. ¶ 63.) They seek reinstatement of the IHO's award of tuition reimbursement in the amount of $126,725. (*Id.*)

### A. The IHO Decision

The IHO concluded that the District failed to establish that it provided J.C. a FAPE for both the 2014-15 and 2015-16 school years. (IHO Decision at 26, 28.)

1. *The 2014-15 IEP*

With respect to the 2014-15 school year, the IHO looked first to Parents' substantive deficiency claims. She considered J.C.'s sixth grade program "as delineated in the September 2014 IEP," which she found to be essentially that proposed in the June 2014 IEP but for the addition of the speech-language services. (*Id.* at 22.) She rejected Parents' argument that the June 2014 IEP was deficient because it failed to include such services and that the September 2014 IEP which provided those services was untimely. (*Id.* at 21.)

She reached this conclusion based on the notes from both CSE meetings and parent M.C.'s testimony during the hearing. (Dist. Exs. 10-11; Tr. p. 828.) She found that the CSE determined that a speech-language evaluation was necessary based on information provided during the June 2014 CSE meeting. (Dist. Ex. 10 at 1.) She found that they agreed to and did reconvene in September 2014 to review the results of that evaluation. (*Id.*) And she found that the CSE added speech-language to J.C.'s program and developed speech-language goals for his IEP. (Dist. Ex. 11.)

The IHO noted that parent M.C. "acknowledged being aware of a planned September meeting at the time of the June CSE review and there is no indication that any objection was made to this plan." (IHO Decision; Tr. p. 828.) She further noted that Parents did not object nor seek an earlier review when they received the June 2014 IEP, "which included a reference to a meeting within the first 2 weeks of school to consider the SL evaluation." (IHO Decision at 22; Dist. Ex. 10.)

Moving to the substance of the September 2014 IEP, while the IHO acknowledged that the district developed "a very comprehensive" program that "addressed all areas of student deficit,"

she nonetheless concluded that it failed to demonstrate that the program was reasonably calculated to enable J.C. to make meaningful educational gains. (IHO Decision at 22.)

The IHO concluded that given J.C.'s "medical circumstances and the degree of change of academic environment proposed," the District needed more information before making the recommendations in the 2014-15 IEP. (IHO Decision at 24.) She took issue with the fact that the District "conducted no new evaluations but relied solely on information concerning [J.C.]'s performance at [Eagle Hill] as well as the observation of a single class." (*Id.*) Even if J.C.'s symptoms had stabilized during his time at Eagle Hill, the IHO found this "an insufficient basis for a change in placement without additional evaluations." (*Id.*)

The IHO compared J.C.'s current placement with the District's recommended placement, noting that, while J.C. had for several years attended Eagle Hill, "a small special education school with classes principally having 5-7 students with some classes even smaller and a program of highly differentiated instruction," the CSE recommended transferring him to Hommocks Middle School, "a large middle school of some 1200 children and placing him in general education classes, some ICT, with likely some 25 students, and with a complex system of supports, academic and otherwise, tailored for him." (IHO Decision at 23.)

Based on the information before the CSE at the June and September 2014 meetings, the IHO determined that the CSE was aware that "a change to a new and radically different educational environment" could trigger J.C.'s "interfering and socially embarrassing behaviors" – specifically, his tics, OCD rituals, and severe anxiety. (*Id.* at 23.) Noting the relationship between these conditions, she referred to Dr. Walker's "unrebutted and credible testimony that . . . tics can be triggered if the student is in a very stressful academic setting, when he feels a lot of anxiety triggered by OCD or when the ADHD is not well controlled." (*Id.* at 23.) She found this to be

consistent with the results from the May 2013 educational evaluation conducted by district school psychologist Dr. Fox. (*Id.*)

The IHO rejected the District's claim that it was not informed that tics or other behaviors were interfering with J.C.'s learning at Eagle Hill when it was developing the 2014-15 IEP. She found that such behaviors had been communicated in a number of ways. First, she credited parent M.C.'s testimony that, during the June 2014 CSE meeting, Kathy Quinn, J.C.'s educational advisor at Eagle Hill, reported that, "even in the familiar and supportive [Eagle Hill] environment," J.C. was distracted by tics and experienced sleepiness and arousal issues. (*Id.* at 24.) She did not credit "any testimony inconsistent with that." (*Id.*) She was also persuaded that Parents themselves communicated to the CSE similar information about J.C.'s tics, sleepiness, and other behaviors, "and voiced .... the concern that larger classes would result in more ticking." (*Id.*)

The IHO questioned the District's claim that it was not aware of the tracking and reporting system in place at Eagle Hill, which "shows that there had been extended periods of varying behaviors" related to tics and sleepiness prior to the June 2014 review. (*Id.*) She noted that this system was specifically referenced in the IEP immediately preceding the June 2014 IEP and was mentioned in the June 2014 Advisor Report – which, though not available at the June 2014 review, was available thereafter. (*Id.*)

Regardless of what the District knew about the tracking system, the IHO determined that because the District did not proactively seek more information about J.C.'s tics and other behavioral issues, it "failed to make an appropriate effort to ensure that it had relevant information, particularly critical when further psychological evaluations were not being obtained." (*Id.* at 25-26.)

Based on the above, the IHO concluded that the District "failed to establish that the 2014-15 program was reasonably calculated to enable the student to make meaningful educational gains" and, therefore, "failed to establish it provided a FAPE." (*Id.* at 26.)

While noting it was unnecessary to do so in light of this determination, the IHO went on to consider Parents' procedural defect claims. (*Id.*)

For the 2014-15 school year, Parents alleged that four procedural violations, taken together, impeded J.C.'s right to a FAPE, significantly impeded Parents' opportunity to participate, and caused deprivation of educational benefits. They claimed that: (1) the goals in the IEP were generic, did not respond to J.C.'s deficits, and contained no method of measurement; (2) the CSE had insufficient evaluative material; (3) the District failed to have an appropriate in place at the beginning of the school year; and (4) the program recommended was predetermined by the CSE.

Though she did not explicitly decide whether these alleged violations were tantamount to a denial of FAPE, the IHO categorically rejected Parents' claims regarding the adequacy of the annual goals set forth in the IEP, the timeliness of the IEP eventually developed for the 2014-15 school year, and predetermination. (*Id.* at 26.) As for the sufficiency of the evaluative material, the IHO noted, "The CSE had substantial evaluative material at the time of the review. However, as discussed above with regard to substantive sufficiency, I conclude that that material was not sufficient to support the recommendation made." (*Id.*)

2. *The 2015-16 IEP*

The IHO turned next to the substantive sufficiency of the 2015-16 IEP. She started this discussion by incorporating her previous findings and conclusions from the 2014-15 IEP analysis – specifically, that the District knew of J.C.'s challenges; that further evaluation was necessary to consider the impact of "the very different program and environment proposed in view of those

challenges"; that the information the District relied upon was inadequate; and that the District failed to make "appropriate and reasonable inquiry in view of the substantial change that was being proposed." (*Id.* at 27.)

She again rejected the District's claim that it was not informed that J.C.'s behaviors were interfering with his learning at Eagle Hill, noting that the District had, again, conducted a single classroom observation during which "spontaneous repeated movements were noted." (*Id.*) She credited parent M.C.'s testimony that J.C.'s educational advisor, Theresa Fox, discussed the fact that Eagle Hill was keeping track of behaviors including sleepiness and lack of arousal, and that Parents had discussed these issues and reiterated J.C.'s "need for a small class and the limitations of the district's observation" during the April 2015 CSE meeting. (*Id.*)

While the IHO acknowledged Dr. Walker's opinion that J.C.'s tics went from "very unstable" in September 2014 to "fairly well controlled" thereafter, she also noted that Dr. Walker continued to believe that J.C. required "the type of program provided by [Eagle Hill]," which she communicated in a letter to the April 2015 CSE by letter. (IHO Decision at 28; Dist. Ex. 55.) The IHO found that there was "nothing in the record indicating that the CSE considered Dr. Walker's letter." (IHO Decision at 28.) She also found that, at the District's request, Dr. Walker had discussed her recommendations with District school psychologist Dr. Ross who had "apparently made an oral report of some kind," but that there was "no indication as to what it was, whether it was ever communicated to the CSE as a whole and what weight, if any, it was given." (*Id.*)

Despite Dr. Walker's opinion that J.C.'s tics had stabilized over the course of fifth grade at Eagle Hill, the IHO found it significant that his 2014-15 tracking sheets "continue[d] to show a substantial level of behaviors" for this school year. (IHO Decision at 27.) She also credited Theresa

Fox's testimony that not all observations reported to her were recorded and Dr. Fox's statement from the May 2013 evaluation that J.C.'s movements could be easily missed. (*Id.* at 28.)

Ultimately, the IHO concluded that in light of "the challenges of [J.C.]'s diagnosed conditions and his emotional fragility," additional evaluative material was necessary before the CSE could reasonably determine that the recommended program was appropriate. (IHO Decision at 28.) She found that the District thus failed to establish that it provided J.C. a FAPE. (*Id.*)

The IHO went on to consider Parents' procedural defect claims, even though she noted that it was "unnecessary to do so in view of the foregoing findings." (*Id.* at 29.)

For the 2015-16 school year, the IHO considered three alleged procedural violations. Parents argued that the goals in the IEP were inadequate; that the CSE did not have sufficient evaluative material at the time of the review; and that the CSE's recommendation was predetermined and denied meaningful parental participation. (*Id.*)

The IHO rejected Parents' claim that the goals were generic, unresponsive to J.C.'s deficits, and lacking a method of measurement. (*Id.*) As was true with regard to the 2014-15 IEP, she found that the record demonstrated that neither Parents nor the participating members of the Eagle Hill staff objected to the goals discussed at the April 2015 CSE meeting. (*Id.*) Moreover, the IHO credited Theresa Fox's testimony that Eagle Hill staff had provided input into the 2015-16 goals "which resulted in modifications and that the resulting goals were appropriate." (*Id.*)

As to the sufficiency of the evaluative material relied upon by the CSE, the IHO once again noted that while "substantial, . . . with regard to substantive sufficiency . . . that material was not sufficient to support the recommendation made." (*Id.*)

Finally, the IHO concluded that, contrary to Parents' assertion, the evidence showed that both Parents and Eagle Hill participants "had and exercised the opportunity to participate with

regard to all areas of the IEP." (*Id.*) She found no evidence that Parents were denied the right to comment on or propose alternatives to the District's recommendation, but rather, "that the IEP specifically addressed certain specific parent concerns raised at the review." (*Id.*) For example, while nothing in the record indicated specific discussion of Dr. Walker's recommendations, the IHO concluded that Parents were not precluded from bringing, and did in fact bring, those recommendations to the CSE's attention during the April 2015 review. (*Id.*)

3. *Eagle Hill*

Having determined that the District failed to establish that it provided J.C. with a FAPE for both the 2014-15 and 2015-16 school years, the IHO turned to the question of whether Eagle Hill was an appropriate alternative placement as defined by the IDEA – *i.e.*, whether it was reasonably calculated to enable J.C. to receive educational benefits. After an extensive discussion of the services, staff, and structure in place at Eagle Hill, the IHO determined that Parents had established that it was an appropriate program for J.C. (*Id.* at 35.)

4. *Equitable Considerations*

Finally, the IHO considered whether equitable factors supported Parents' claim for tuition reimbursement for the 2014-15 and 2015-16 school years. As the District did not allege and the record did not support a claim that Parents failed to cooperate with either the Department of Education or the CSE, the IHO found "no basis for denying or limiting reimbursement for tuition for the school years claimed." (*Id.* at 36.) She thus ordered the District to immediately reimburse Parents for tuition at Eagle Hill for the 2014-15 and 2015-16 school years ($62,275 and $64,450, respectively). (*Id.*)

B. <u>The SRO Decision</u>

Before turning to the substance of the two IEPs at issue, the SRO first considered the procedural violations that Parents "consider[ed] to have risen to the level of a denial of a FAPE." (SRO Decision at 10.) She found that, while Parents' memorandum of law specified a number of alleged procedural defects, they had failed to identify these issues in their answer and cross-appeal, as required by New York law. *See* 8 N.Y.C.R.R. §§ 279.4; 279.6; 279.8(a)(3), (b). As "neither party appealed from the IHO's determinations regarding parental participation and predetermination; the timeliness of the September 2014 IEP; the adequacy and appropriateness of the goals found in the IEPs for both the 2014-15 and 2015-16 school years; and whether equitable factors weighed in favor of an award of tuition reimbursement," the SRO ruled that those findings had become final and binding upon the parties. As a result, she did not consider them on the merits. (SRO Decision at 10-11.)

The SRO did comment, in a footnote, that "a review of the entire hearing record reveals that, even if proper[l]y appealed, the evidence would not warrant reversal of the IHO's ultimate determinations on these points." (*Id.* at 10 n.6.)

1. *2014-15 IEP*

a. Sufficiency of the Evaluative Information

As to the sufficiency of the evaluative information before the CSE, the SRO concluded that the June 2014 and September 2014 CSEs ("the 2014-15 CSE") considered significantly more sources of information than the single classroom observation cited by Parents and the IHO. (SRO Decision at 11-18.) She found that the CSE considered seven sources of information in total: (1) an April 2013 psychological evaluation conducted by Dr. Fox, which included the results of the Wechsler Intelligence Scale for Children IV ("WISC-IV")); (2) a May 2013 educational evaluation also conducted by Dr. Fox, which included the results of the Wechsler Individual Achievement

Test-III ("WIAT-III"); (3) - (4) two Eagle Hill progress reports from December 2013 and June 2014, respectively; (5) the March 2014 classroom observation by district school psychologist Kristen Arita; (6) the June 2014 speech-language reevaluation performed by District speech-language pathologist Nancy Albertson; and (7) input from both Parents and Eagle Hill staff. (SRO Decision at 12-13.)

*The April 2013 Psychological Evaluation*

The SRO found that the April 2013 psychological evaluation provided the CSE with information regarding J.C.'s "cognitive functioning, perceptual-motor skills, behavior, and social/emotional functioning." (*Id.* at 12.) She reviewed Dr. Fox's observations of J.C. during the testing process and noted that while J.C. presented as alert, engaged, and motivated, he also "fidgeted in his chair, repeatedly touched his chest in apparent self-stimulation, rocked slightly, and periodically squinted his eyes" – though, Dr. Fox opined, these movements "would have been missed under more casual observation." (*Id.*) Overall, she noted that Dr. Fox found J.C.'s tics had improved since his previous observation. (*Id.*)

As for the results of the WISC-IV, the SRO noted standard scores in four areas – verbal comprehension, perceptual reasoning, working memory, and processing speed – and a full-scale IQ of 90, placing J.C. in the 25th percentile. (*Id.*) She noted Dr. Fox's conclusion that J.C. was "of at least average intelligence and that his high average performance on a task of verbal reasoning suggested a higher potential for scholastic and reasoning areas." (*Id.*) He attributed J.C.'s low average scaled scores to anxiety triggered by tasks measuring working memory and tasks that required him to "produce," a circumstance that was "likely true in school as well." (*Id.*)

In the areas of perceptual-motor skills, the SRO noted that the accuracy of J.C.'s drawings suggested to Dr. Fox that J.C. was performing adequately despite an awkward right-handed grip

during writing tasks. (*Id.*) However, she also noted Dr. Fox's conclusion that J.C.'s "immature, expansive, and impulsive drawing" indicated difficulty with motor planning. (*Id.*)

Finally, the SRO noted an apparent paradox observed by Dr. Fox during the April 2013 evaluation. While J.C. demonstrated "an unusual level of politeness, emotional innocence, fragility, and social deficits," he also appeared "capable of nuanced and broad-ranging awareness of social/emotional workings." (*Id.*) Dr. Fox hypothesized this incongruity was due to the facts that much of J.C.'s "social/emotional awareness was intellectualized, lacking affect, and used defensively." (*Id.*)

*The May 2013 Educational Evaluation*

Next, the SRO considered Dr. Fox's May 2013 educational evaluation, which focused on J.C.'s academic abilities. (*Id.*) Dr. Fox described J.C.'s behavior throughout testing as polite, cooperative, and cheerful. (*Id.*) But he also noted that the "energy and humor" with which J.C. completed many subtests faded as the evaluation wore on; during the last few subtests, J.C. conveyed that he was tired and literally began to fall asleep – a phenomenon that, as Dr. Fox noted, occurred periodically during J.C.'s normal school day routine. (*Id.*)

The SRO reviewed Dr. Fox's analysis of J.C.'s scores on the WIAT-III, which yielded standard scores in six areas – word reading, spelling, reading comprehension, essay composition, numerical operations, and math problem solving. (*Id.* at 13.) Dr. Fox counted phonics, vocabulary, and spelling among J.C.'s strengths, but noted "some difficulty determining which spelling to use for similar sounding parts of words ("'tious'" and "'cious'") and discriminating between vowel sounds for unfamiliar words." (*Id.*) In reading, Dr. Fox noted that while J.C. read at grade level, his silent reading was relatively slow and that he preferred questions that required reasoning and summarizing over fact questions that called for looking back at the text. (*Id.*) J.C. appeared

generally comfortable and enthusiastic about essay composition tasks, but less eager for the math portion of the assessment. (*Id.*) These results indicated to Dr. Fox that J.C. continued to struggle with working memory. (*Id.*)

Of course, both the April 2013 and May 2014 evaluations were both available to and considered by previous CSEs that had recommended alternative out-of-district placement for J.C. for the two previous school years. Therefore, the SRO turned to the new, additional information considered by the 2014-15 CSEs – information that should have justified the new mainstreaming recommendation.

*The December 2013 Eagle Hill Progress Report*

The SRO began with the December 2013 Eagle Hill progress report, which "described the student's social skills, learning style and metacognitive abilities, and classroom performance." (*Id.*) Socially, the report indicated that J.C. both enjoyed and worked hard to acquire the skills necessary for successful peer interaction and that he had matured since the previous year. (*Id.*) Still, his impulsive utterances and body movements sometimes "interfered with his ability to manage group social situations." (*Id.*)

J.C. had also become a more active participant in class and appeared eager to share his ideas. (*Id.*) The report suggested that J.C. benefitted from predictable and highly structured classroom settings that offered "visuals, games, multisensory, and hands-on activities," and where instructions were communicated with clear and precise language. (*Id.*) He also continued to require significant support to manage his fatigue, processing, attention, and impulsivity. (*Id.*)

The SRO reviewed the report's summary of J.C.'s academic performance in ELA, Math, Writing, General Science, and Literature, including subtopics within each. (*Id.* at 14.) In Reading, J.C. was able to perform many skills independently at a third/fourth-grade level, but required direct

instruction or guidance for others, including making inferences and identifying cause-and-effect relationships. (*Id.*) In Math, J.C. was able to complete many multiplication and division problems independently, but required direct instruction for multi-step and practical application problems. (*Id.*) In Writing, he was able to independently formulate two-to-four paragraph compositions, but required guidance when it came to complex sentences and paragraph organization. (*Id.*) In Science, J.C. generally required guidance. (*Id.*) The report also explained a number of classroom modifications that proved helpful to J.C. (*Id.*)

Finally, the SRO reviewed the speech-language section, which indicated that J.C. participated in one "2:1 speech-language session per week along with collaborative speech-language services," including, when appropriate, "the presence of a speech-language pathologist in class." (*Id.*) J.C.'s long term speech-language goals included "improving skills related to word knowledge, summarization abilities, and inferential reasoning abilities." (*Id.*)

*The March 2014 Classroom Observation*

The SRO summarized the March 2014 classroom observation performed by district school psychologist Kristen Arita. (*Id.*) She noted that, overall, Arita found J.C. to be diligent, hardworking, and engaged. (*Id.*) He followed routines well and appeared to understand classroom expectations, working well independently, but also assisting peers when necessary. (*Id.*) Arita noted, however, that J.C. continued to engage in spontaneous body movements – most notably shoulder shrugs – when listening to his peers. (*Id.*)

*The June 2014 Eagle Hill Progress Report*

SRO Harrington then reviewed a second Eagle Hill progress report, from June 2014. Much like its December 2013 counterpart, this report discussed J.C.'s social skills, behavior in the

classroom, learning style, and academic performance. However, this report also contained the results of several standardized reading and writing assessments. (*Id.* at 14-15.)

The SRO looked at J.C.'s performance across specific academic subjects, comparing them to the December 2013 report. She noted that in Reading, J.C. was now "working with materials at a fourth to fifth grade level and had made some progress in his ability to independently apply vocabulary and comprehension skills." (*Id.*) In Math, J.C. continued to require similar levels of guidance and instruction in problem solving, place value, computation, and practical application. (*Id.*) In Writing, J.C. continued to require guidance with complex sentences and paragraph organization, but was independently performing "skills related to spelling, grammar and mechanics, and sentence structure and composition." (*Id.*) The report indicated that J.C. still required guidance across all general science skills. (*Id.*) And it again listed classroom modifications that were helpful for J.C. (*Id.*)

The report also indicated that J.C. had improved toward his speech-language goals, including generating main idea statements and making inferences, but continued to struggle with word associations and recalling facts from text. (*Id.*) In terms of services, the report indicated that J.C. continued to receive collaborative speech-language services, but now received one 2:1 speech-language session per week in an individual, as opposed to group, setting. (*Id.*)

The SRO reviewed J.C.'s results on the Group Reading Assessment and Diagnostic Evaluation ("GRADE"), the Gray Oral Reading Test-Fifth Edition ("GORT-5"), the Slosson Oral Reading Test ("SORT"), and the Educational Records Bureau ("ERB") Writing Assessment Program, included in the June 2014 progress report. On the GRADE, J.C.'s total performance and composite comprehension scores were both in the 37 percentile and his vocabulary subtest score was in the 34 percentile. (*Id.*) On the GORT-5, J.C. scored in the 63 percentile in rate, the 50

percentile in both accuracy and fluency, and the 9 percentile in comprehension. (*Id.* at 15-16.) In a subsequent GORT-5 administration, J.C.'s rate score went down while all other scores remained the same. (*Id.* at 16.)

J.C. scored 109 on two administrations of the Slosson Oral Reading Test ("SORT"), one in the spring of 2013 and the other in the spring of 2014. (*Id.*) And finally, on the Educational Records Bureau ("ERB") Writing Assessment Program, J.C. "performed at a percentile rank of 6 based on suburban norms and a percentile rank of 10 based on independent norms." (*Id.*)[2]

Overall, the June 2014 Eagle Hill progress report indicated that J.C. was polite and caring but benefitted from reminders to be "flexible and mature." (*Id.*) Use of manipulatives and the "activboard" helped J.C. retain information, but he still needed assistance in managing his fatigue, processing, and attentional issues, which "tremendously impacted" his active learning skills. (*Id.*) To maintain appropriate behavior in the classroom, the report stated that J.C. was dependent on small classes and cueing from his teachers. (*Id.* at 15.)

With these supports in place and clear, consistent instruction, the report stated that J.C. was able to produce "quality work." (*Id.*) And when "available to learn," he was reported to be an active participant, interested in learning new material, willing to complete all tasks, and exhibited a desire to perform well in all of his classes." (*Id.*)

*The June 2014 Speech-Language Reevaluation*

Next, the SRO summarized the results of the speech-language evaluation conducted by district speech pathologist Nancy Albertson in June 2014, which conveyed information regarding J.C.'s "receptive and expressive language, language content and memory, and speech parameters."

---

[2] These norms compare students in particular school setting that are historically higher performing – suburban schools and independent (private) schools. Hommocks Middle School, the school into which J.C. was to be mainstreamed, is a suburban school.

(*Id.*) Albertson's report indicated that J.C. exhibited difficulties with memory skills – he particularly he struggled in his ability to recall verbally-presented information without "repetition, visuals, and scaffolding." (*Id.*) And because his knowledge of semantic relationships was reduced – *e.g.*, comparative, spatial, sequential, and passive concepts – Albertson noted that J.C. might struggle to "follow oral directions and interpret both written and verbal information in an academic setting." (*Id.*)

The SRO also reviewed the results of the Clinical Evaluation of Language Fundamentals-Fifth Edition ("CELF-5") Albertson administered, which yielded standard scores in core language, receptive language, expressive language, language content, and language memory. (*Id.*) Overall, however, testing showed that J.C.'s language skills were "reduced" for age-level expectations. (*Id.*)

*Input from Parents and Eagle Hill Representatives*

Finally, based on evidence that was adduced at the impartial hearing, the SRO found that both Parents and the Eagle Hill staff who participated in the 2014-15 CSE meetings provided information about J.C.'s "availability for learning, the effects of his tics, and his sleepiness." (*Id.*)

Ultimately, the SRO concluded, "Based on the above and contrary to the parents' assertion, the hearing record shows that the 2014-15 CSE considered new evaluative and anecdotal information when determining the student's educational needs and developing a program for the student for the 2014-15 school year." (*Id.*) She found that the September 2014 IEP reflected and incorporated the information about J.C. described in the sources described above. For example, it:

> [I]ncluded information from the standardized assessment of the student's cognitive skills indicating that he demonstrated at least average intelligence with high average verbal reasoning and mildly constricted working memory. In the area of academic achievement, the student's reading, writing, and math skills were within the average to superior range on standardized testing, and the September 2014 IEP reflected these results by providing the standard scores in each of the academic areas.

(*Id.* at 16.) She also found that the IEP's description of J.C.'s academic abilities aligned with the information contained within the December 2013 and June 2014 Eagle Hill progress reports, indicating the tasks that J.C. could perform independently and those for which he required guidance and/or direct instruction. (*Id.* at 17.)

Similarly, the SRO found that the IEP's description of J.C.'s social development largely tracked the information described above. It indicated that J.C. "enjoyed social interactions, was friendly and social, and worked hard to learn the social skills needed to interact with peers." (*Id.*) It noted that J.C.'s impulsivity sometimes impacted his ability to socialize appropriately in group settings, and that he "benefitted from the use of social scripts to initiate conversations with adults and peers." (*Id.*)

The SRO disagreed with the IHO's conclusion that the CSE overlooked J.C.'s medical and psychological needs and should have obtained further information about his tics and sleepiness given the variability of his behaviors and the recommended change in placement. (*Id.*) In particular, she disagreed with the IHO's concern that the CSE did not consider the 2013-14 Eagle Hill data tracking sheets and two letters from J.C.'s private healthcare providers.

The SRO noted that the tracking sheets included three categories of observational data from the 2013-14 school year – J.C.'s engagement (good/poor), his tiredness (none/some/lots), and his movements (none/some/lots). His engagement was observed as "good" about 105 times and "poor" about 15 times; his tiredness was observed as "none" about 87 times, "some" about 24 times, and "lots" 5 times; his movements were observed as "none" about 47 times, "some" approximately 54 times, and "lots" 12 times. (*Id.*) She further noted that the May 2014 letter from J.C.'s neurologist noted a need for daily teacher reporting in connection with his "level of alertness, sleepiness and

tics," and that Dr. Walker's September 2014 letter indicated the frequency of J.C.'s vocal and motor tics "caused significant distraction for the student and those around him." (*Id.*)

With respect to J.C.'s tics, the SRO found that the September 2014 IEP clearly reflected the CSE's awareness of these issues. (*Id.* at 18.) She noted that the special alerts section of the IEP indicated that J.C. experienced tics and involuntary movements as a result of his Tourette's disorder and that he was prescribed medication to address those needs. (*Id.*) She further noted that the IEP described J.C.'s difficulty with regulating his body movements and controlling his utterances. (*Id.*)

The SRO acknowledged that the IEP did not mention J.C.'s fatigue but found, based on Albano's hearing testimony, that the June 2014 CSE had considered this issue. (*Id.*) Albano recalled discussing the fact that J.C. experienced "a great deal of fatigue in the evenings," which impacted his ability to complete homework assignments. (*Id.*) Her recollection was that J.C.'s fatigue had improved overall, which she speculated could be due to maturation. (*Id.*) Thus, the SRO concluded that, "while not explicitly described, review of the September 2014 IEP as a whole reveals that the CSE recommended supports and accommodations to address the student's fatigue," which she described in the following section. (*Id.*)

To the extent that the CSE failed to consider the tracking sheets, the SRO found that they merely reinforced information already known to the CSE and would not have led to a different recommendation for J.C.'s program and placement. (*Id.*) She found this to be equally true of the letters from J.C.'s private healthcare providers, which included a May 2014 letter from J.C.'s neurologist noting the need for daily teacher reporting of J.C.'s sleepiness and tics, as well as a September 15, 2014 letter from Dr. Walker addressed, "To Whom it May Concern," indicating

that, in her opinion, J.C.'s vocal and motor tics "occurred frequently and caused significant distraction for the student and those around him." (*Id.*)

The SRO rejected the IHO's finding that the District was required to "seek out additional information from Eagle Hill or elsewhere where the existing evaluative data available to it was sufficient to develop an appropriate IEP," as additional assessments are only necessary "if found necessary to fill in gaps in the initial review of existing evaluative data." (*Id.* at 19.) She found that the evidence did not support the IHO's conclusion that the information before the 2014-15 CSE contained such gaps. (*Id.*)

b. Educational Placement and Program

With this information in mind, the SRO turned to the recommendations the CSE made. She concluded that the evidence did not support the IHO's conclusion that this program was not reasonably calculated to enable J.C. to make educational gains. (*Id.*) The SRO reproduced those recommendations, which are listed *supra*, p. 8. She also noted that the IEP referenced a transition plan that the CSE developed in anticipation of J.C.'s return to public school. (SRO Decision at 19.)

I note here that, because the SRO considered the 2014-15 program as delineated in the September 2014 IEP, she included the speech-language services that were initially absent from the June 2014 IEP. She also included without comment the recommendations for enhanced staffing in Science and Social Studies, double-time for testing, and individual psychological counseling which, as described *supra*, were not included on the June 2014 IEP until Parents informed the District of its error.

For the rationale behind these recommendations, the SRO relied primarily on the testimony of Albano and District school psychologist Cynthia McKean, both members of J.C.'s CSEs.

*ICT Services*

The SRO looked first to the CSE's recommendation for ICT services in Math and English. She began with the definition of ICT under state regulation. ICT refers to:

> 'specially designed instruction and academic instruction provided to a group of students with disabilities and nondisabled students . . . The maximum number of students with disabilities receiving [ICT] services in a class shall not exceed 12 students' and school personnel assigned to such a classroom shall 'minimally include a special education teacher and a general education teacher.'

(*Id.* (quoting 8 N.Y.C.R.R. § 200.6(g).)

The SRO noted that, according to Albano, ICT classes would address J.C.'s working memory issues. (*Id.*) In English, for example, the special education teacher would be able to preview and review material, as well as provide prompting. (*Id.*) In Math, Albano testified that ICT classes "would offer a 'great deal of support' for a student who has a relative weakness with working memory but was able to do grade level work," like J.C. (*Id.*) In both subjects, the collaboration between the general and special education teacher would allow J.C.'s needs to be recognized and implemented on a daily basis (*e.g.*, a visual cue to recall a formula). (*Id.*)

The SRO found that the school psychologist's testimony buttressed Albano's opinions. Based on his "cognitive potential," McKean concluded that an ICT setting was an "excellent model" for J.C. (*Id.*) Unlike a special class, the ICT setting would offer J.C. peer models at an appropriate academic pace – in other words, it provided him "access to typical peers but also provided the supports needed to address his working memory deficits." (*Id.* at 21.)

*Resource Room*

The SRO again began her discussion by providing the definition of this service in New York State. State regulations define resource room as a "special education program for a student with a disability registered in either a special class who is in need of specialized supplementary

instruction in an individual or small group setting for a portion of the school day." (*Id.* (citing N.Y.C.R.R. §§ 200.1(rr); 200.6(f)).) She then turned to the hearing transcript.

Albano explained that the CSE felt daily resource room was appropriate given J.C.'s "anxiety and need to have processes explained," and because the resource room teacher, as a "part of the team," would have the opportunity to communicate with his other teachers on a daily basis. (*Id.*) She further explained that the CSE recommended resource room over the typically-recommended skills class because, while the latter often had about 10-15 students, a resource room class at times had less than five students. (*Id.*) McKean added that resource room was an intensive program where J.C. could build compensatory skills, work toward his annual goals, and work on planning and organization. (*Id.*)

*Social Skills Group*

Albano testified that the social skills group recommended by the CSE was run by a school psychologist and was designed to allow students to create friendships in addition to working on specific skills. (*Id.*) McKean opined that the features of this program would be particularly helpful to J.C., who, at times, could be "tangential." (*Id.*) For example, the group focused on "taking the perspective of the other person and learning conversational skills." (*Id.*) She added that this group would also address issues related to J.C.'s transition back to public school. (*Id.*)

*Psychological Counseling and Psychiatric Consultation*

Albano described a two-part rationale behind the CSE's recommendation for psychological counseling. In school, the psychologist would be someone with whom J.C. could become familiar and develop a relationship, and who would be in a position to support him if he felt stress or anxiety during the day. (*Id.*) Outside of school, the psychologist could "function as a case manager" who collaborated with J.C.'s outside providers, including his private therapists. (*Id.*) McKean added

that the CSE recommended the psychiatric consultation "to provide additional medical knowledge and feedback." (*Id.*)

*Enhanced Staffing*

The SRO next reviewed Albano's and McKean's testimonial explanation of the enhanced staffing recommendation. Albano explained that J.C. would have an aide or teaching assistant present during his general education Social Studies and Science classes, who would provide him with "redirection and additional support." (*Id.*) For example, she noted that J.C. asked many clarifying questions; if he asked "too many," enhanced staffers, rather than the classroom teacher, would be able to assist him. (*Id.*) McKean confirmed this account. (*Id.*)

Albano testified that the CSE recommended enhanced staffing for lunch and recess in response to Parents' concern about bullying. (*Id.*) Enhanced staff would "monitor peer interactions and support generalization of the social skills learned in the social skills group." (*Id.*) McKean added that unstructured times such as lunch and recess could be a particularly challenging times for students with social deficits and that enhanced staffing would "put somebody in place to provide feedback." (*Id.*)

*3:1 Aide*

With respect to the CSE's recommendation for a 3:1 aide, the SRO considered Albano's testimony that a teaching assistant would support J.C. by carrying over plans from his resource room program to his general education classes and collecting data "as requested by the school psychologist." (*Id.*) McKean similarly testified that the teaching assistant would "modify the curriculum under the teacher's direction" and monitor or collect data on J.C.'s tics. (*Id.*)

*Supplemental Aids and Services*

The SRO reviewed McKean's testimony explaining the rationale and purpose behind the various aids and services included in J.C.'s 2014-15 IEP. She testified that:

> the study guide outline was an organizational tool that would help the student structure what he needed to study; clarification of instructions would help make sure the student understood what was being asked of him; and graphic organizers would serve as an organizational tool for the student and reduce the anxiety of "where to begin."

(*Id.* at 22-23.) She indicated that the use of breaks was a suggestion from the participating Eagle Hill staff members who indicated that J.C. sometimes became overwhelmed and benefitted from having time to regroup. (*Id.* at 23.) Providing J.C. with copies of class notes would help J.C. if he struggled to both attend and write during class and address his working memory issues. (*Id.*) And, finally, according to McKean, home communication was a particularly important component of the IEP because it allowed staff to report back to Parents about medication management, which, in turn, kept J.C.'s medical providers up to date on his tics and fatigue. (*Id.*)

*J.C.'s Transition Back to the District*

The SRO next addressed the important topic of what consideration the CSE gave to the issue of J.C.'s transition from Eagle Hill back to public school. (*Id.*) She disagreed with the IHO's finding that the CSE failed to address the possibility that, as J.C. transitioned back to the District, he would experience anxiety and that his tics and OCD behaviors would worsen, along with their "concomitant fatigue and inattention." (*Id.*) She found that the CSE "gave careful consideration" to this possibility. (*Id.*)

Specifically, she found that services such as daily resource room, psychological counseling, provision of a 3:1 teaching assistant, enhanced staffing, and planned consultations between school faculty and J.C.'s private providers were recommended in order to reduce J.C.'s "anxiety, manage his medical needs, and enhance his ability to participate in instruction." (*Id.*) She noted Albano's testimony that there was "a good deal of discussion" among the CSE members

about J.C.'s transition back to the public school and that they created a transition plan for that purpose – a plan, according to McKean, specifically designed to support J.C.'s "reintegration to the district." (*Id.*) Moreover, Albano noted that the CSE provided, at Parents request, for J.C. to be met by an adult at the door of the school each day. (*Id.*)

The SRO found that the IHO's objection to the proposed programming in light of "the degree of the proposed change" was overstated. (*Id.*) Because the CSE is obligated to annually reassess each student's needs "at that particular point in time," she noted, "the fact that a subsequent CSE recommends a different program or placement than what was recommended in a previous year does not, ipso facto," mean the current recommendation fails to meet the student's needs. (*Id.* at 24.) The SRO posited that this was particularly true in the instant case, as Parents "disagreed with the CSEs' recommendations in the preceding school years and, therefore, the student never attended the placements recommended by the CSEs." (*Id.*)

The SRO examined the basis for the previous years' recommendations for an out of District placement. She found that the December 2011 CSE recommended that J.C. transition out of the District based on his medical and emotional needs, which called for close monitoring throughout the school day. (*Id.*) She further found that the CSE continued this recommendation for the 2012-13 school year because, at that time, J.C. often fell asleep during class, struggled to maintain energy and attention even when he was awake, and lacked awareness that his tics and OCD behaviors were "off-putting" to others – factors that negatively affected his academic performance and pace. (*Id.*)

She then reviewed McKean's observations of J.C. in an Eagle Hill tutorial class in April 2013, which indicated that his "functioning had improved," and that he was "very attentive and enthusiastic throughout the lesson." (*Id.*) McKean testified, however, that she did not believe

transitioning J.C. back to the District public schools was appropriate at this time because, at least in part, he would then have to "transition two years in a row, first back to the elementary school and next up to the middle school the following year." (*Id.*) She further testified that transitioning J.C. back the following year, to the "departmentalized model" (*i.e.*, class-to-class) of the middle school, would better facilitate his special education programming than the "non-departmentalized" elementary school model. (*Id.*) As described previously, the CSE ultimately continued its recommendation of a State-approved day program for fifth grade, which J.C. did not attend. (*Id.* at 24-25.)

The SRO found that the observations and testimony of Albano and McKean indicated that, by the spring of 2014, J.C.'s tics had decreased relative to previous years and did not appear to be interfering with his ability to learn. (*Id.*) She determined that keeping J.C. out of the general education environment was inconsistent with Least Restrictive Environment principles, because the information available to the June and September 2014 CSEs established that he could receive educational benefit in that setting "with the use of supplementary aids and services." (*Id.*) Considering the "multiple supports, modifications, and individualized aspects of the placement and program recommendation," the SRO concluded that "the IHO's conclusion that the IEP was inappropriate for the student is unsupported by the hearing record." (*Id.*)

Ultimately, she concluded that the 2014-15 CSE recommended services designed to support J.C.'s "anxiety, working memory and attention, academics, social skills, language processing, and his level of arousal/sleepiness, while providing him with appropriate access to his nondisabled peers." (*Id.*)

2. *2015-16 IEP*

a. Evaluative Information and Present Levels of Performance

The SRO also disagreed with the IHO's conclusion that the 2015-16 CSE had insufficient information to support its recommendation for J.C.'s seventh grade. (*Id.* at 25.) She found that it considered the evaluative reports detailed above as well as more recent evaluative reports. The latter include a December 2014 Eagle Hill progress report and two classroom observations from March 2015. (*Id.*) The former include Dr. Fox's April 2013 psychological evaluation; Dr. Fox's May 2013 educational evaluation; and Nancy Albertson's June 2014 speech-language evaluation. (*Id.*) The SRO also noted that District staff "communicated with Eagle Hill staff to obtain more current information" and that Parents and representatives from Eagle Hill participated in the April 2015 CSE meeting. (*Id.*) She reviewed the new sources in turn.

*December 2014 Eagle Hill Progress Report*

The SRO found that the December 2014 progress report indicated J.C. had transitioned well to Eagle Hill's upper school and, with continued support and accommodations from his teachers, was able to manage the increased challenges. (*Id.*) It noted, for example, that when the demands of the school proved strenuous for J.C., his teachers would allow him "breaks, time to get up and move, collaborative learning experiences, and shifting from sitting to standing." (*Id.*) The report also stated that J.C. was beginning to demonstrate active learning skills in the classroom, was developing self-advocacy skills, and was asking clarifying questions. (*Id.*) Socially, the SRO noted that J.C. was reported as active and engaged in conversation with his peers and teachers. (*Id.*)

Like the previous progress reports, this report included a breakdown of the subject-specific skills that J.C. was able to perform independently and those for which he still required guidance and/or direct instruction, as well as the classroom modifications that proved helpful. The SRO reviewed the summaries of J.C.'s performance in his Reading, Literature, Writing, Math, World

History, and Study Skills classes. (*Id.*) In Reading, J.C. required guidance and/or direct instruction in most areas – including vocabulary, reading comprehension, and written expression – and demonstrated relatively few skills independently. (*Id.*)

J.C. was able, however, to perform most skills in his Literature class independently, including vocabulary, reading comprehension, identifying concepts, making predictions, sequencing stories, and comparing and contrasting. (*Id.*) He required guidance to "discriminate between relevant and irrelevant details" and to "identify cause and effect relationships," and required direct instruction to summarize a story. (*Id.*) In Writing, J.C. could generate ideas, write compound sentences, and compose simple paragraphs independently, but required direct instruction to proofread and to complete longer, more developed compositions. (*Id.*)

J.C. applied almost all math skills either independently or with guidance. (*Id.*) He required direct instruction to complete multi-step problems, to compare fractions, and to understand decimals. (*Id.*) In World History, the report indicated that J.C. required guidance to "generalize previously learned materials, identify the impact of historical events, and compare and contrast concepts." (*Id.*) He required direct instruction to "prepare for tests, take complete notes, turn his notes into a rough draft, and edit a rough draft into a final draft." (*Id.*) In his Study Skills class, J.C. was able to complete most tasks independently or with guidance, "but required direct instruction to take complete notes and use his notes to summarize what he had read." (*Id.*)

Finally, the speech-language section of the progress report indicated that J.C. participated in one weekly 2:1 pull-out speech-language session and continued to receive collaborative speech-language services. (*Id.*) It noted that J.C.'s long-term goals were to "improve semantic language, inferential reading skills, and auditory memory skills." (*Id.*)

*March 2015 Observations*

The SRO found that the CSE also relied on information from two classroom observations, one by Albano and the other by Arita, which reported similar behaviors. On the one hand, J.C. was an active and enthusiastic class participant, providing input and asking clarifying questions; he appeared organized, independently setting up his class materials and packing them up again at the end of class; and demonstrated good learning skills, advocating "well for himself when he needed additional assistance." (*Id.* at 27.) On the other hand, both Albano and Arita noted ticking behavior – Albano reported that, on two occasions, J.C. repeatedly touched his hand to his chin; and Arita noted that J.C. fidgeted, which at times required scaffolding support. (*Id.*)

*Input from Parents and Eagle Hill Staff*

"In addition to the written evaluations and reports," the SRO noted M.C.'s testimony that she and the Eagle Hill staff who attended the April 2015 CSE meeting described J.C.'s "academic, medical, and attention needs," including his fatigue and anxiety. (*Id.*)

Based on the foregoing, the SRO found that the April 2015 CSE considered information that identified J.C.'s academic, attentional, cognitive, behavioral, speech-language, and social/emotional needs and that this information was sufficient to develop an appropriate IEP for J.C.. (*Id.*)

She found that the IEP's description of J.C.'s present levels of achievement and social/physical development were consistent with the sources above. (*Id.*) For example, the IEP included a breakdown of the skills that J.C. could perform independently and those for which he still required guidance and/or direct instruction that reflected the information from the December 2014 Eagle Hill progress report. (*Id.*) M.C. testified that neither Parents nor participating Eagle Hill staff disagreed with the presentation of the J.C.'s needs during the April 2015 CSE meeting. (*Id.*)

SRO Harrington also disagreed with the IHO's determination that the CSE failed to review relevant information because it did not explicitly consider the Eagle Hill data tracking sheets or a letter from J.C.'s private psychiatrist. (*Id.* at 27-28.) As was true during the previous school year, the data sheets kept track of J.C.'s movements and tiredness, using notations such as "none," "some," and "lots" to describe the frequency of occurrence. The SRO summarized this data, which covered "discontinuous portions of the 2014-15 school year." (*Id.* at 28.) J.C.'s movements were observed as "none" about 306 times, "little" about 21 times, "some" 23 times, and "lots" 3 times. (*Id.*) His sleepiness was observed as "none" about 222 times, "little" about 146 times, "some" 40 times, "lots" 9 times, and "lots and lots" 2 times. (*Id.*)

Moreover, the SRO considered a letter sent by J.C.'s psychiatrist, Dr. Walker. In that letter, Dr. Walker stated that J.C.'s "ongoing residual verbal and motor tics" and impulsivity both distracted him from learning and "made him a 'potential target' for teasing and bullying." (*Id.* & n.22) She also stated that J.C.'s medications caused him to experience fatigue, "which demanded more than one-to-one attention from school staff." (*Id.*) She recommended that J.C. attend a small, highly-structured school with an ideal 6:1 ratio and flexibility in academic grouping with "one-to-one support as needed to monitor his attention and comprehension." (*Id.*) It is not clear whether the CSE ever received this letter.

The SRO concluded that, while these sources were not identified in the IEP as having been considered, the CSE considered, and the 2015-16 IEP reflected, the substance of the information they provided:

> In the same manner as described above, the data tracking sheets and correspondence from the student's private psychiatrist offered additional detail about the student's tics and fatigue but, again, did not contradict information considered by the CSE about the student's needs. . .[T]he failure to provide greater specificity regarding the student's medical needs on the IEP did not rise to the level of a denial of a FAPE.

(*Id.* at 29.) Ultimately, she concluded that the District was not required to seek out additional information, from Eagle Hill or elsewhere, because the evaluative information the CSE considered was sufficient to allow it to develop an IEP for J.C.'s 2015-16 school year. (*Id.*)

b. Educational Placement and Program

The final section of the SRO's opinion analyzed the educational program and placement recommended by the April 2015 CSE. For reasons similar to those discussed with respect to the 2014-15 school year, the SRO concluded that the IHO had erred in finding that the program recommended by the April 2015 CSE denied J.C. a FAPE as those recommendations were appropriate to meet J.C.'s needs. (*Id.*)

She noted that the most significant changes from the September 2014 IEP included the addition of direct consultant teacher services and removal of enhanced staffing for Science and Social Studies, the removal of enhanced staffing in lunch and recess, and the removal of the 3:1 teaching assistant for academic classes. (*Id.*) She then provided New York State's definition of direct consultant teacher services, as "specially designed individualized or group instruction provided by a certified special education teacher . . . to a student with a disability to aid such student to benefit from the student's regular education classes." (*Id.* at 29-30.) She also noted that the 2015-16 IEP continued the recommendation for ICT services in English and Math and included a 55-minute daily resource room program; one 30-minute social skills group; one 30-minute individual psychological counseling session; one 44-minute each of pull-out individual and group speech-language; and one 50-minute session of push-in speech-language therapy. (*Id.* at 29.)

The SRO referred to Albano's testimony for the rationale behind these recommendations. (*Id.*) Albano testified that the CSE believed ICT services in English and Math continued to be appropriate for the same reasons they were recommended in the previous year, *i.e.*, the ability of

the special education teacher to preview and review material, as well as provide prompting. She testified that the direct consultant teacher services were added because the seventh-grade curriculum was more rigorous and a consultant teacher could break down and help J.C. better understand the content. (*Id.* at 30.)

Albano reiterated the "team" rationale behind the resource room recommendation – that the special education teachers and the psychologist would "coordinate skills instruction and monitor the student's tics, anxiety, fatigue, and attention." (*Id.*) She testified that the resource room program would also allow for the previewing and reviewing of instruction and would offer J.C. "skills instruction, organization, and planning for homework." (*Id.*) She stated that the counseling services were included to support J.C.'s transition back to the District. (*Id.*) And finally, Albano stated that she believed the supplementary aids, services, and modifications were appropriate for J.C., and that "the CSE members did not voice disagreement." (*Id.*)

The SRO noted that, while the CSE did not recommend a small special class, as Dr. Walker had recommended, "the IEP provided for similar supports and accommodations through the recommended program, including the provision for the smaller setting of the resource room on a daily basis." (*Id.*) In light of the Eagle Hill staff's apparent representation that J.C.'s biggest academic obstacle in the classroom were his attentional difficulties and the success of "brain breaks," the SRO noted that the CSE recommended modifications directed at redirection, including refocusing breaks, preferential seating, a copy of class notes, study guide outlines, adult guidance for organization (*e.g.*, the use of checklists), a graphic organizer, "as well as annual goals that focused on improving [J.C.]'s attention to task and assignments across all academic settings." (*Id.* at 30-31.)

She found that the CSE's recommended combination of individual and small group speech-language therapy, social skills group, and individual psychological counseling addressed J.C.'s need for "small group and individualized supports related to social/emotional functioning and language skills." (*Id.* at 31.) She also noted the CSE's test accommodation recommendations, including "extended time, the use of breaks on lengthy tests creating fatigue and the use of a word processor for all tests requiring lengthy written responses," and its recommendation that J.C. have access to his laptop. (*Id.*)

Finally, the SRO disagreed with the IHO's conclusion that the 2015-16 CSE did not include sufficient support "considering the change in placement which entailed moving the student from a small private school to a larger general education district program." (*Id.*) First, she found that the CSE-developed transition plan included strategies to support both J.C.'s academic and his social/emotional needs, including the provision of a teaching assistant for the first six weeks of school. (*Id.*) The transition plan stated that a Functional Behavioral Assessment "would be completed to determine if interventions were required to address the student's behaviors relating to his Tourette's disorder and fatigue, as well as if a teaching assistant continued to be an appropriate support." (*Id.*) It further indicated that J.C.'s transition back to the District would be "evaluated through a program review after the progress report," and would be measured by his "academic performance and acclimation to the integrated school setting." (*Id.*)

Ultimately, the SRO concluded, "As with the September 2014 IEP, the CSE's obligation to develop an appropriate program in the LRE further supports the recommendation for a general education classroom placement with the ICT, consultant teacher, and resource room services, along with the related services and accommodations/modifications." (*Id.* at 32.) While J.C. "may have experienced a difficult transition to the public school setting, the CSE prepared for this and,

as a whole, the recommendation constellation of supports and services was reasonably calculated to enable [him] to make meaningful educational gains." (*Id.*)

Having reached these conclusions, the SRO did not consider whether Eagle Hill was an appropriate placement or whether the equities favored reimbursement.

## DISCUSSION

No party has indicated that I have before me any evidence that was not considered by the state agency. Thus, my review "is based entirely on the same evidence as that before the SRO," a circumstance warranting more deference to the administrative decision than a case in which "the district court has before it additional evidence." *M.H.*, 685 F.3d at 244 (internal citations omitted).

### I. The SRO Properly Concluded that the Parents Failed to Raise, and so Abandoned, Their Objections to the IHO's Procedural Rulings

The SRO concluded that the Parents abandoned any objection to the IHO's procedural rulings by failing to raise them properly. I agree.

Parents were entitled to seek review of portions of the IHO's decision about which they felt aggrieved (which in this case were limited to certain procedurals challenges to the CSE's work) by way of a cross-appeal. However, they could not simply say, "We cross appeal from the IHO's procedural rulings." Rather, they were obligated to "clearly specify" their reasons for challenging the IHO's decision; to identify the precise rulings presented for review; and to cite to the pertinent portions of the record on appeal. 8 N.Y.C.R.R. § 279.4(f); *id.* § 279.8(c)(3). Issues not so identified in the cross-appeal are properly "deemed abandoned" by the SRO. *Id.* § 279.8(c)(4).

Parents submitted the following statement in their cross-appeal with respect to both the 2014-15 IEP and the 2015-16 IEP: "Petitioners appeal from the IHO's determination regarding the procedural inadequacies in the development of the Student's IEPs in so far as these inadequacies impeded the Student's right to a FAPE, significantly impeded the Parents' opportunity to participate in the decision-making process regarding the provision of a FAPE, and caused a deprivation of educational benefits." (Verified Answer/Cross Appeal ¶ 15, 16.) I agree with the SRO that this sentence does not "clearly specify" Parents' reasons for challenging the IHO's decision. It fails to identify the precise rulings presented for review and it fails to cite to the pertinent portions of the record on appeal, as required in order to raise an issue on cross-appeal. In fact, this sentence does not specify anything at all; it simply parrots the language of the statute about what an IEP cannot do. The phrase "procedural inadequacies," without more, simply does not meet the state's pleading requirement. Therefore, the SRO did not err in deeming the cross-appeal inadequate and Parents' challenges to CSE procedures abandoned.

In the alternative, the SRO's conclusion that the evidence in the record "would not warrant reversal of the IHO's ultimate determinations on these points," had they been properly appealed, is entirely sound. (See SRO Decision at 10, n.6.) The IHO's reasoned analysis of Parents' challenges to the procedures followed by the CSE are amply supported by the record. To take but one example, the hearing transcript of hearing demonstrates that members of the Eagle Hill staff had input during the CSE's formulation of the 2015-16 IEP, which input resulted in changes to the goals included in that IEP. (Tr. pp. 1349-51.)

II. <u>The SRO Did Not Err in Concluding that the CSE Considered Sufficient Data In Formulating the 2014-15 IEP</u>

As a technical matter, Parents' challenge to the sufficiency of the data considered by the CSE falls within the ruling just announced, as this was one of the alleged procedural defects in CSE procedures during the two years in question. However, the adequacy of information considered by the CSE is inextricably intertwined with the validity of its decision on the merits, so despite her ruling on the abandonment issue, the SRO discussed the adequacy of information considered by the CSE in that context. Agreeing in this instance with the IHO (SRO Decision at 12-16), the SRO concluded that the CSE considered multiple sources of information in formulating the IEPs for J.C. for both the 2014-15 and 2015-16 school years, and that any information identified by the Parents that may not have been explicitly considered was cumulative. After an exhaustive review of the record, I believe the SRO's conclusion to be fully supported.

The text of the September 2014 IEP indicates that the CSE considered the seven sources of information identified in her discussion of the evaluative information before the 2014-15 CSEs. (*See* Dist. Ex. 11.)

Under "Academic Achievement, Functional Performance and Learning Characteristics," the IEP indicates that the CSE considered J.C.'s Eagle Hill progress reports from both December 2013 (Dist. Ex. 38) and June 2014(Parent Ex. I) – *i.e.*, the two progress reports for the immediately preceding school year. (*Id.* at 3-4.)

Under "Evaluation Results," the IEP indicates that the CSE considered three tests: Dr. Fox's April 2013 psychological evaluation, which included administration of the WISC-IV (*id.* at 3); Dr. Fox's May 2013 educational evaluation, which included administration of the WIAT-III (*id.* at 2); and Nancy Albertson's June 2014 speech/language reevaluation. (*Id.* at 2.)

The IEP also indicates that the CSE considered the results of a March 2014 classroom observation (Dist. Ex. 34) and of a June 2014 speech/language reevaluation. (Dist. Ex. 39.)

In addition to these seven items, the CSE considered input from Parents and from participating Eagle Hill staff (Tr. pp. 722-24; 982-83.)

The SRO thoroughly reviewed the information provided by each source, and supports her conclusion that it had sufficient information to develop an appropriate program.

The Eagle Hill progress reports indicated that J.C. had long-standing issues with fatigue, processing, attention, and impulsivity, which interfered with learning and continued to require a significant degree of support. (Dist. Ex. 38 at 2; Parent Ex. I at 2.) But the reports also indicated that J.C. made considerable progress during the 2013-14 academic year. The December 2013 and June 2014 progress reports indicated that J.C. was capable of producing quality work in a small, highly-structured classroom with clear and consistent instruction. (*Id.* at 2.) The June 2014 report, in particular, indicated improvement in his speech-language skills from December 2013. It showed that J.C. went from a weekly 2:1 group speech-language session to a 1:1 individual speech-setting session in the span of months, and that he demonstrated improvement in making linguistic inferences. (Dist. Ex. 38 at 16-17.) Eagle Hill identified tools that could help J.C., including active learning tools such as visuals, games, multisensory, and hands-on activities. (Dist. Ex. 38 at 4-5, 16-17; Parent Ex. I at 2.) The CSE had detailed information about J.C.'s ability to perform subject-specific tasks and whether he required guidance or direct instruction. (Dist. Ex. 38 at 7, 11, 14, 16; Parent Ex. I at 4-15.)

This information was supplemented by Arita's summary of her March 2014 observation of J.C. at Eagle Hill. (Dist. Ex. 34.) Arita found that J.C. presented as diligent, engaged, and hardworking. (*Id.*) She saw that J.C. worked well independently, but was able to work with

others when called for, and that he was generally able to follow classroom routines. (*Id.*) She did note that J.C. exhibited physical tics, particularly when he was listening to others.

Parents argue (and the IHO originally found) that this classroom observation did not provide the CSE with probative information, because a single observation could not capture the "expected variability with regard to behaviors depending on time of day, current medication and 'waxing and waning' disorders." (IHO Decision at 25.) However, Arita's observation was consistent with other evidence. The Eagle Hill progress reports, which describe J.C.'s behavior over much longer periods of time and contain more information than a single observation ever could (*See, e.g.*, Parent Exs. I, O.), are not inconsistent with Arita's observations. For instance, just as Arita observed that J.C. is attentive to the daily class lesson, engaged with his peers, and diligent in completing his work (*see* Dist. Ex. 34), the Eagle Hill progress reports note that J.C. "always has a positive attitude" (Parent Ex. O at 1) is "encouraging and supportive of classmates" (*id.*), is "beginning to be reflective on the work he completes" (*id.*) and "continues to complete work of good quality." (Parent Ex. I at 2.) Arita's observation further states that J.C. engages in "spontaneous body movements, particularly shoulder shrugs" and takes an occasional "break to periodically stretch in his seat" (Dist. Ex. 34) – which aligns with the Eagle Hill progress report notations stating that J.C. "[a]t times, [] needs teacher guidance to sustan the informal conversations among his peers" and occasionally "ask[s] for a break in class to . . . refocus" his attention. (Parent Ex. O at 1).

The CSE thus was justified in relying on Arita's observation as corroborative evidence of J.C.'s progress.

When it met again in September, the CSE also considered the results of Albertson's June 2014 speech-language evaluation (the CELF-5 test), which indicated that J.C.'s language skills

were "reduced" relative to age-level expectations. (Dist. Ex. 39 at 5.) The fact that the CSE considered this particular source is self-evident since, as discussed previously, the CSE made significant changes to J.C.'s original IEP based on the these test results. The revised IEP issued in September 2014 includes several additional speech-language recommendations, including a weekly individual speech-language therapy session, a weekly small group speech-language therapy session, a weekly speech-language therapy consultation, five additional goals in the areas of speaking/listening and speech/language. It also provided for J.C. to receive copies of class notes. (Dist. Ex. 11at 8-9.)[3]

Finally, the record supports the SRO's conclusion that the CSE was made aware of and Parents and considered J.C.'s tics and sleepiness to the June 2014 CSE. Both the Parents and the Eagle Hill representatives discussed these issues with the CSE. At the hearing, M.C. testified that she described to the CSE how J.C.'s ticking behavior interfered with his learning:

> I used the example of what I had witnessed when the tic got in the way, . . . in particular the tic I used was the one where his hands would go from his stomach up his head and down his body . . . and if he is writing taking notes or reading, what I would discover is when he finished with the tic and would go back, he had no idea where he was. He was lost and it was like you had to start all over again.

---

[3] A word about the two IEPs relevant to the 2014-15 school year. As described above, the CSE originally developed an IEP for J.C. in June 2014; it revised that IEP in September 2014, in order to incorporate changes indicated by the results of J.C.'s June 2014 speech-language reevaluation. Both the IHO and the SRO concluded that the September 2014 IEP was the operative IEP for purposes of analyzing the District's recommendations for the 2014-15 year. (IHO Decision at 22; SRO Decision at 11 n.7.) I agree. The record shows that Parents were aware that the CSE wanted to do further language testing on J.C. in June 2014 before finalizing his IEP for the 2014-15 school year – M.C. testified that she recalled discussing at the June 2014 CSE meeting the fact that a CSE would also be held "within the first two weeks to review speech-language evaluation." (Tr. p. 828.) – and there is no evidence that anyone, whether the parents nor representatives of Eagle Hill "voiced any objection or concerns regarding having a CSE meeting within the first two weeks of school to review the speech and language evaluation that was being conducted." (*Id.*) That the CSE made adjustments to J.C.'s 2014-15 IEP based on the results of the June 2014 reevaluation is not evidence that the June 2014 IEP was inadequate; rather, it is evidence that the CSE carried out a plan that was put in place during its initial meeting. The parents were not prejudiced by the delay in performing the speech-language evaluation, as they had enrolled J.C. in Eagle Hill and paid the tuition for the 2014-15 school year, not just before the September IEP was finalized, but before the June IEP was created.

(Tr. p. 723-24.) She also testified that she explained to the CSE that J.C. "fell asleep a lot" – that he would lie down in a corner or on the couches in common areas and fall asleep, and that others would kick at his backpack, poke him, or steal his computer. (Tr. p. 724.) J.C.'s Eagle Hill educational advisor also discussed his tics and sleepiness with the CSE. (Tr. p. 982.)

The evidence about J.C's ticking was disturbing, but it was not entirely negative. Arita, whose classroom observation was one basis for the 2014-15 IEP, testified at the hearing about J.C.'s ticking behaviors, which she had also observed in prior years; she indicating that it had improved by 2012-13 (Tr. 101-04). McKean, another psychologist and member of J.C.'s CSE, testified that J.C.'s ticking, while not "completely subsided," had decreased "dramatically" and was much less distracting to the child – which made it easier for him to engage in his lessons. (*Id.* at 50, 58-59, 103-04).[4]

Parents argue that the CSE could not have relied on several other sources – notably, letters from J.C.'s doctors – both because they are not mentioned in the IEP and because the IEP does not deal with the behaviors the doctors described. However, these two letters – each of which is just two sentences long – add nothing to what the CSE already knew.

The letter from Dr. Jacobson, J.C.'s neurologist, emphasizes "the need for daily teacher reporting and review regarding [J.C.]'s level of alertness, sleepiness and tics continuously throughout the day." (Dist. Ex. 45 at 5.) And the letter from Dr. Walker indicates her opinion that J.C.'s tics "occur frequently causing significant distraction for [J.C.] and those around him." (Parent Ex. E at 2.) But the CSE had that information from other sources about ticking and fatigue; and it developed the 2014-15 educational program with those issues in mind. (Tr. pp. 74.) J.C.'s tics are referenced throughout the September 2014 IEP. It notes that, "Student is

[4] It is not clear to me whether this information taken from the child's record was in the CSE.

currently prescribed medication for attentional issues. Student has tics and involuntary movements as a result of his Tourette Syndrome," (Dist. Ex. 11 at 1), and that J.C. "tends to have a hard time regulating what he says as well as his body movements." (*Id.* at 5). And while the CSE did not include the words "fatigue" or "sleepiness" when it developed the IEP, the CSE was aware of this information, based on M.C.'s testimony that she discussed this very issue at the June 2014 meeting, and that it was raised by both Parents and Kathy Quinn. (Tr. p. 982.) The CSE included supports to facilitate daily monitoring of J.C.'s behaviors, such as the teaching assistant, in order to compensate for these precise behaviors.

In short, the CSE had information about all aspects of J.C's educational needs and accomplishments. There is no basis to conclude that the SRO erred when she held that the 2014-15 CSE had and considered sufficient information regarding J.C.'s academic, social/emotional, medical, and attentional needs to develop the program it recommended for that school year.

B. <u>The 2014-15 IEP Offered J.C. a FAPE</u>

We now move to a different question: was the program developed by the CSE reasonably calculated to allow J.C. to make meaningful educational progress? The SRO found that it did; Parents demur.

This is the aspect of the SRO's decision that deserves the greatest degree of deference from the Court. Where the content of the IEP is concerned, the dispute between the Defendant District and the Parents is "a dispute over an appropriate educational methodology," which is precisely the sort of dispute where judges – who are not experts in pedagogy -- are expected to defer to the SRO, who are far more familiar with such matters. *M.H.*, *supra.*, 685 F. 3d at 244.

The SRO agreed with the CSE that J.C. could make educational progress in a general education setting with appropriate supports. Because IDEA's goal is to "open the door of public

education to handicapped children an appropriate terms," rather than "to guarantee any particular level of education once inside," *Rowley, supra.*, 458 U.S. at 192, the statute embodies "a deliberate preference for mainstreaming students to the maximum extent possible," *C.L. Scarsdale Union Free Sch. Dist.*, 913 F. Supp. 2d 26, 39 (S.D.N.Y. 2012). If it is possible for a student to make progress in a mainstream setting, with appropriate access to nondisabled peers, then that is the appropriate educational setting – even though it might not guarantee the student "everything that might be thought desirable by loving parents." *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 132 (2d Cir. 1998) (internal quotation marks and citation omitted).

The SRO's conclusions, like the CSE's conclusions, rested on the fact that J.C. had experienced both academic and behavioral improvement in the preceding school year (Tr. 144-48). The evidence in the record demonstrated that, during the 2013-14 school year, J.C was "engaged and part of the discussion" in the classroom (*Id.* at 49); that he "was very attentive and enthusiastic throughout the lesson" (Dist Ex. 35); and that his ticking behavior, while not "completely subsided," and decreased "dramatically" and so was less distracting to him. (*Id.* at 50, 103-04.) The record similarly evinced J.C.'s development in a number of academic areas, particularly in Reading and Writing, which dovetailed with J.C.'s becoming a more active class participant. *See supra* 21-27. Albano noted in her March 2014 observation that J.C. was eager to participate in school, followed classroom routines, paid attention to tasks, and functioned in a "very appropriate and seemingly productive way." (*Id.* 144-45.) Albano opined that her observations did not cause her concern about the District's ability to meet J.C.'s needs in a special education program at Hommocks Midlde School. Finally, the IEP developed by the CSE called for extensive supports for J.C., which were calculated to address his learning issues and

reasonably designed to help him continue to make progress in a least restrictive environment setting.

I agree with the SRO that the record contains objective indications of progress that lend support to the conclusion that he would have been able to learn in a general education setting for the 2014-15 school year.

Parents complain that the SRO glossed over the fact that any improvement in their son's performance came in the highly structured setting at Eagle Hill – a school that is unquestionably the "gold standard" for educating learning disabled students in Westchester and Fairfield Counties, where classes are small, instruction is clear and consistent, and students are closely monitored at all times. (Parents Ex. I at 2.) They also argue that, by not recommending a more gradual transition to mainstream classroom education, the IEP was obviously deficient. As support for this argument, Parents argue that the IEP developed for J.C. during the 2013-14 school year (which they rejected in favor of sending him to Eagle Hill) did not call for mainstreaming the boy, but rather for putting him in an intermediate setting – a therapeutic day school program approved by New York State. (Dist. Exs. 2 and 8.) As far as they are concerned, the fact that the immediately preceding recommendation was for an intermediate setting automatically means that the recommendation for an even greater change in J.C.'s placement is not supportable.

The SRO disagreed with this argument below, and I disagree with it today.

The district representative, McKean, testified that the CSE had considered mainstreaming J.C. for the 2013-14 school years, but decided against that in order to avoid his having to make two different institutional transitions in two years. 2013-14 was J.C.'s last year in elementary school. An IPE recommending that J.C. come to the district elementary school for fifth grade

would have necessarily entailed two major changes for him, as the district's middle school was in a different building than the elementary school. McKean also testified that transferring J.C. for the last year of elementary school would have resulted in his being pulled out of his regular classroom repeatedly, which the CSE deemed undesirable for the boy. In middle school, by contrast, where all students changed classrooms for different classes, J.C.'s going to resource room, or for counseling or additional support sessions, would neither call so much attention to his disabled status nor result in his missing "swaths of missed instruction" in his regular classrooms. (Dist. Ex. 8 at 54-56). For that reason, the district did not alter its 2013-14 recommendation from its 2012-13 recommendation, which had also called for J.C. to attend a therapeutic day school.

It would unquestionably have been useful for the CSE to know whether the boy had made progress in an intermediate environment (less restrictive than Eagle Hill, more restrictive than a mainstream classroom) before it recommended mainstreaming him. But that evidence was not available because the parents unilaterally rejected the CSE's previous recommendations and sent their son to Eagle Hill – the most restrictive placement. The CSE concluded, on the basis of the evidence that was available to it, that J.C. had made sufficient progress in a private school setting to warrant mainstreaming, albeit with extensive support. The SRO, after reviewing a record that contained considerable evidence about J.C.'s progress, agreed with the CSE's assessment. Since there was objective evidence of progress in the administrative hearing record, I cannot say that the SRO's assessment about an appropriate educational methodology for the boy was erroneous.

I am certain that the district's proposed program would not have replicated the class size, structure and supports available at Eagle Hill. (IHO Decision at 23.) But that is not the standard the statute imposed on the CSE. J.C. would undoubtedly have encountered new and different

challenges at Hommocks School had he gone there during 2014-15. But the SRO's conclusion that J.C. would have gained educational benefit in a general educations setting with supports is sufficiently reasoned and consistent with both the evidence of the boy's past progress and the explicit preference for mainstreaming that both IDEA and New York State law reflect.

I thus affirm the SRO's conclusion that the 2014-15 IEP recommended a program that was calculated to allow J.C. to make progress consistent in the least restrictive educational environment – which is to say, that the IEP offered him a free appropriate public education.

C. The CSE Considered Sufficient Evidence in Formulating the 2015-16 IEP

The SRO concluded that, in formulating the April 2015 IEP for the next succeeding school year (which again recommended mainstreaming with supports), the CSE considered sufficient evidence about the boy's academic, attentional, cognitive, behavioral, speech-language and social/emotional needs. That evidence included the April 2013 psychological evaluation, the May 2013 educational evaluation, the June 2014 speech-language evaluation, the December 2014 Eagle Hill progress report (which was the most recent progress report), two March 2015 classroom observations, and input from Parents and Eagle Hill staff during the April 2015 CSE meeting. (Dist. Ex. 12 at 2-3) While the earliest evaluations were two years old at the time of the April 2015 CSE meeting, they were not outdated, because the regulations required only that they be updated every three years. 8 N.Y.C.R.R. § 200.4(b)(4); *see also* 34 C.F.R. § 300.303(b)(1)-(2).

The December 2014 progress report allowed the CSE to evaluate J.C.'s transition to Eagle Hill's upper school. There he was successfully managing increased challenges with appropriate support and accommodations (Dist. Ex. 40 at 2.) The report indicated that J.C. was "able to prioritize his work independently and typically completed most of his work in study hall

at school." While attention was J.C.'s "biggest struggle in the academic realm," the report noted that he benefitted from "brain breaks" and from having longer assignments "broken up over a period of days." (*Id.*) The report, like previous progress reports, provided the CSE with a detailed breakdown of the boy's abilities across various subject-specific skills, noting his relative strengths and weaknesses. (*Id.* at 2-17.) The SRO found, and the record confirms, that while the IEP gave no indication that the CSE had considered "tracking" data about J.C.'s tics and sleepiness, the information in Eagle Hill's tracking charts – which indicated that there were significant amounts of time when the boy exhibited neither behavior, and a few occasions when the boy exhibited ticking or tiredness – that data was not contradicted by other information available to the CSE. The observations conducted by Albano and Arita, who had been observing J.C. for some years, confirmed the fact that the boy had made a smooth transition to upper school and was demonstrating good learning skills – asking clarifying questions and advocating for himself when he needed additional assistance – despite some ticking behavior. (*Id.* at 27) And while the boy's psychiatrist (whose letter the CSE never received, and so never considered) recommended that he remain in small classrooms, the CSE obviously understood that fact – which was consistently advocated by Parents – and provided alternative avenues to give the boy needed support and accommodation, including individual and small group speech-language therapy and daily resource room.

The record does not support the SRO's finding that District staff communicated with Eagle Hill's staff to "obtain more current information" – which I assume means information about J.C.'s progress or lack of same during the months of January, February and March 2015. There is no evidence in the record indicating that such inquiry was made. However, I have no reason to do anything but conclude that the SRO was correct in concluding that the District was

not required to ask for an update for the period after the December 2014 Eagle Hill evaluation. There is no evidence, from the parents, the Eagle Hill participants at the CSE meeting, or anyone else to indicate that J.C.'s performance deteriorated after the first of the year 2015.

In short, the SRO did not err in concluding that the CSE had sufficient information to develop an IEP for J.C. for the 2015-16 school year.

D. The 2015-16 IEP Offered J.C. a FAPE

As was true of the previous year's IEP, the disagreement between the CSE and the Parents over J.C.'s 2015-16 IEP is not really about whether the CSE was well-informed about J.C.'s medical, physical and social/emotional needs. Rather, it is about the CSE's conclusion that J.C., notwithstanding these documented needs, could succeed in a general education setting if he was given appropriate supports, versus the Parents' insistence that their son could not receive educational benefit without the small classes and greater individual support he was afforded at Eagle Hill.

The constellation of supports and services recommended in the April 2015 IEP, coupled with J.C.'s continued academic and social progress, make it at least plausible that the boy would have been able to gain some educational benefit pursuant to the IEP. I quite understand that "educational benefit" is not what Parents want for their son. They want the gold standard for their son; they want to maximize his potential. But a FAPE is not equivalent to the gold standard, and it does not have to maximize the student's potential. Applying the statutory standard rather than the "loving parents" standard, and giving appropriate deference to the SRO's conclusions about matters relating to educational methods, I affirm the SRO's conclusion that the 2015-16 IEP was reasonably calculated to enable J.C. to learn in the least restrictive environment, and so afforded him a FAPE.

## CONCLUSION

Because the SRO's decision with respect to both IEPs is affirmed, there is no need to address either the appropriateness of J.C.'s placement at Eagle Hill or whether equities favor tuition reimbursement.

Parents' motion for summary judgment is DENIED.

The Clerk of Court is directed to remove the motion at Docket #15 from the Court's list of open motions.

Dated: September 28, 2018

Chief Judge

BY ECF TO ALL COUNSEL